We'll call our second case of this morning. Consolidated case numbers 18-1520 and 1521, Yoc-Us and Kalel Esponsa v. Attorney General. Ms. Kline and Ms. Camilleri. Take your time, no urgency. May I ask a question? We have a lot of fascinating issues here, but I wondered, even if we were to agree that the I-213 should be excluded, is there anything that prevents ICE from re-apprehending Mr. Kalel Esposante? They'd have to have reasonable suspicion based on something other than the fruit of this poisonous tree in order to pick him back up again. So in this case, ICE only got involved because it was state troopers' improper prolonging of the stop is out the door. So they could not conduct a search in any way for him? Not unless they had independent reasonable suspicion that had nothing to do with this incident. Independent reasonable suspicion that he did not belong in this country? I suppose, or if our petitioners were picked up for some other way and during the course of those proceedings, there was a question about immigration status, perhaps. But they can't just sort of let him go because the evidence is suppressed here and then pick him up the next day because they know who he is. What's the analysis under Lopez-Mendoza when you have the state officials who are the ones whose conduct is being questioned? How do we reason through the application of Lopez-Mendoza? So we would argue that Lopez-Mendoza doesn't apply. But if it does... You would say it doesn't apply because... Yes, that's why. Sorry, the restrictions of Lopez-Mendoza that were interpreted in Oliva-Ramos that require egregiousness... Egregiousness are widespread. So you say across the board it just needs to be unreasonable under the Fourth Amendment? That's correct. Because Oliva-Ramos and Lopez-Mendoza, the egregiousness and widespread standard had to do with an investigation involving federal agents. And the balancing test that was developed under Janus and then adopted in Lopez-Mendoza was specifically aimed at federal agents who had specific training, who had specific rules and regulations. The deterrent effect wasn't that great because there were other deterrents. But with a state official, is there really any deterrent effect? Because the state turns these petitioners over to the federal government and they really have no stake in what happens to them. As compared to federal officials who make an arrest and then the case goes south because they can't use the deterrent effect here in any way weightier than it would be vis-a-vis the federal officials. We would actually argue that it's actually stronger here, right? Because if you assume that a state officer in this case is interested in detaining and investigating potentially folks unlawfully in the United States, he's got no other restrictions on his conduct. There's no criminal proceeding where the evidence is going to be removed. He's not subject to a lawsuit brought by sort of a deck action that could be brought against one specific agency as it would be with the federal government. There's no other guidance governing the state trooper's conduct. So without the application of the exclusionary rule, he can do whatever he wants and offer up the evidence on a silver platter. And his job is done. The alien has been detained. If there's a 287 agreement with a state officer, then it would be different, wouldn't it? It would be different, but we didn't have one here. But you're asking us to apply a general standard that might apply even in that circumstance. Correct. Why do you think it would be different? What makes a state official so different from a federal official that we are not constrained by Lopez Mendoza and Oliva Ramos? Because the state official has no training, has no rules and regulations governing federal immigration law in which he's subject to. And you think that's going to hold up if we ruled in your favor on that point? We do, because Lopez Mendoza was decided in 1984. Things are different now. When Justice O'Connor wrote that opinion, merely being in the United States unlawfully was a crime, and that was part of her balancing analysis. And that's no longer the case, right? So now she was worried about the deterrent effect she didn't think was very strong, and the cost to society was that we now are sort of letting a guy go ahead and commit what we know is a crime. The playing field has totally changed now, because merely being in the United States unlawfully is not a crime on the one hand. And on the deterrent side, for state troopers, the deterrent argument is much stronger than it would be for federal. I don't get that. I mean, it's one thing to say that in the federal situation, there are so many other things to deter him that this is not that big a deterrent. But why would a state official be deterred at all by exclusion of evidence? Why would he be deterred? Why does he care? Because then if he's going out of his way to look for illegals or hunt for illegals, as we found out, then he gets no reward for that conduct if he behaves improperly and the evidence is excluded. He probably doesn't even know what happens to these people. He turns them over to ICE. He never hears what happens at all. Does he? He has no stake in the proceeding. But the evidence we've moved to submit an exhibit not in the record. This is a Philadelphia article, Philadelphia Inquirer investigation into the Pennsylvania State Police, including specifically Trooper Mackey. And we would submit that if you looked at the statistics regarding Trooper Mackey's arrest records and the number of Hispanics he's arrested and the number of aliens he's brought to ICE, you'll see it goes up and up and up. We think that's precisely because there are no guards on his conduct. There's no 287G arrangement. There's no punishment. There's no downside. That would be true. But to say that the flip side of that means that exclusionary rule would be a deterrent, to me, I think it's a non sequitur. Yeah, we just respectfully disagree. I mean, I'm posing it. Understood. We view officers such as Trooper Mackey as looking specifically to go outside the bounds of their job description to go look for illegal. On the other hand, if we want to disincentivize the state officials because they don't have the training and they're getting involved in a federal scheme, a comprehensive scheme that's treated with a notice to appear rather than an arrest, I mean, that's another, perhaps that's another policy issue. That we would say, OK, apply it because we don't want them doing this because it gets into the federal scheme in a place where they really don't have the training. Exactly right. And if they do want to participate in federal enforcement, then they can enter into the 287 agreement and get the proper training and work cooperatively with ICE rather than going off on their own and doing this without supervision, without guidance and without any sort of check and balance on their behavior. Let's assume for the moment without deciding that we decide that we are bound by the analysis of Lopez Mendoza as at least as accepted also six years ago in Oliva Ramos with respect to, again, federal officials. But we apply it to federal officials. So was the conduct here egregious? Yes, it was egregious for two reasons. The first reason is that was because the pro I should say, let me take a step backwards. The initial stop, we don't challenge. And there's a lot of inks filled on that at the immigration judge level and the BIA. That's not what we're talking about. We're talking about the prolonging of the stop. That's what we argue is egregious. The stop was for for speeding. So I understand you wouldn't challenge. Are you challenging the fact that after the owner of the vehicle gave his license to the officer Mackey and then officer Mackey was understood that at least somebody was in the car who owned it, even though the driver didn't have currently have his license, did opening the door. Was that a constitutional violation? We would say yes. Right. So after the trooper asked the driver for identification who doesn't have it, but offers to call his wife, then the passenger hands over his license and registration. One would expect the trooper to return to his cruiser, plug it into the computer and do a little background check. He doesn't do that. He peeks into the back and sees that there are nine brown skinned Hispanic men sleeping in the back. He goes over, opens the door and immediately starts to question. Did he ask permission to open the door? That's not clear from the record, Your Honor. How would you distinguish Mueller versus Mena where the Supreme Court said that there is no need for a reasonable suspicion to ask someone for their name, date, place of birth or immigration status? So I think it's sort of the landscape has changed in the onset of Rodriguez. So you don't need reasonable suspicion necessarily to ask for identification. If there's a safety concern or you're otherwise doing an incident to the stop in the course of the stop, the difference after Rodriguez is that if you're proceeding on a traffic stop to give a speeding ticket and then you take a right hand turn, a detour from the mission of the stop to ask not just for ID because you want to know whether these guys have a criminal background, but your first question is, let me see your immigration papers. That's a different story. That under Rodriguez is an improper detour into an investigation of other crimes. So that we would argue is the first grounds for this being an egregious violation. And the second ground is that by being... So we'll get to the detention in a second. So if an officer asks someone on a civil matter now, because it's not a crime. So the question is, do you really need even need probable cause? Can I see your papers that allow you to be in this country? What's wrong with that, let alone what's egregious with that? So in your head, is there a terry stop in a car? Well, he's not investigating a crime at this point, is he? So it's a stop and he maybe heard something, who knows? And he opens the door. We don't know if he had permission to open that door or not. What is the constitutional violation just at that point? The constitutional violation here is because he only opened the door and he only asked the questions because he saw that the men had brown skin. And then when they went to answer him, they spoke Spanish. And then he continued. There'd been a bunch of white guys in khakis in the back of that van. I don't think he opens the door. So when it's totally race-based, and the evidence here is that he immediately went from the license and registration to opening the back door. Now, there are other cases where the court has held that it's not an egregious race-based violation where the detainees are nervous or where they take a little detour and try to avoid the police. There's absolutely no evidence of that. Thank you, Ron. So the difference here is that he goes right from license and registration without even checking it to opening the door because the guys in the back seat are Hispanic. And they're sleeping, by the way. So there's no threat. There's no perceived danger to the safety of the officer, which might be another good reason to ask for ID. Did he issue the citation after that? He issued it. Yes. So the crown is actually important here, Your Honor. So this the initial stop takes place on the side of the road. He goes over, opens the door, asks him some questions. And then he says, go drive to a rest stop down the road. Right. So the initial stops at between 740 and 8 o'clock. He asks him a few questions. Go drive a mile down the road. He follows them. Now, this begins the detention. Correct. How long was the detention? Well, the initial stop is between seven. I'm talking about the detention part of it. How long was the detention? An hour. So the record's a little bit unclear. Somewhere between 30 minutes and an hour is what I could discern. Yeah. We think it's even longer than that, depending on you stop it when ICE shows up. The citation is what, 836 or it's after? The citation is, he calls ICE at 830 from the rest stop. And the citation is at 857. So he's interested in ICE, not the traffic ticket. And he's interested in immigration status, totally detours from his mission of writing the ticket, calls ICE. And then only after that does he go back and finish speeding ticket. So your view is that after checking the license and checking to see if there are any outstanding warrants, he's done. That's correct. He needs to be issuing the speeding ticket, not investigating. And letting him go. That's right. Now, how does it fulfill the Lopez or not, the Oliva-Ramos factors that we outlined? How do you put this into egregiousness? Granted, it's unreasonable, and that's fine. But it has to be somewhere between unreasonable and shocks the conscience. So how do you fit it into egregiousness? So Lopez-Mendoza gives us a totality of the circumstances analysis and gives some factors that may be examples. One of those factors, and this court cited to the Second Circuit, one of those factors is race. If the stop is race, if the detention is race-based, that's egregious, period, full stop. We would for egregiousness is that the officer knew or should have known that he had absolutely no authority to enforce the immigration laws on his own. But don't we need to have a, shouldn't there have been a suppression hearing here where the facts are developed and the officer could testify that maybe they were nervous or there was something else going on? And also the timeline is unusual. I mean, the evidence is not clear. So there should have been a suppression hearing. And our clients sent up subpoenas and requested a hearing, requested testimony. None of that was granted. But that brings us back to the question of whether the exclusionary rule applies in a civil matter, because this is not a crime. And there's, we went looking for cases and there's a case from the Supreme Court in 76, I don't know if it was cited in the briefs, United States versus Janus, J-A-N-I-S, 428 U.S. 433. And it says in a civil, this was a tax matter, but in a civil proceeding, exclusionary rule doesn't apply. Janus was different, Your Honor, because in that case, there were criminal matters underlying, and then there was a civil tax proceeding. And the reasoning there was, well, the exclusionary rule has already served its deterrent purpose by excluding the criminal evidence from the criminal proceedings. Now we have a separate tax proceeding. Maybe the deterrence factor isn't as strong over here because the officers already sort of took a hit on the criminal side. And they kind of weighed the cost of society as we see as time goes on, Lopez Mendoza, the reasoning gets a little bit outdated, and now we're in a new ballgame where having unlawful status is not a crime. Another thing that was said in Lopez Mendoza was, you know, the exclusionary rules always been applied vis-a-vis past criminal conduct. And you keep the evidence out, but the conduct has always been committed. But it's never been applied, and I think they use the idea of a hazardous, of what they have done vis-a-vis an ongoing violation. And here we have, albeit not a crime, we have an ongoing violation, not a past crime from a temporal standpoint. Wouldn't it be quite a leap to say that this is the situation that Lopez Mendoza might have anticipated, we use the exclusionary rule? Well, so I think you've put your finger on the issue as we see it, in that Lopez Mendoza, Justice O'Connor, is comparing leaving an unlawful immigrant in the country with an ongoing hazardous waste violation, right? So times have changed, and I don't think- So you're saying the criminal nature had a lot to do with it at that point? Exactly right. And that is different now. That is no longer the law. So we're no longer allowing a crime to continue by allowing an undocumented person to stay in the country. All right. We'll get you back on rebuttal then. Thank you. Ms. Camilleri. Good morning. May it please the Court, this is Dana Camilleri for the Attorney General. In the instant case, petitioners have not met their burden of showing a prima facie egregious violation, which is why there was not a suppression hearing before the board or before the immigration judge. Here, they've only offered their speculation because there's nothing in the record about any race-based motives from the officer. So you're assuming that we have a Lopez Mendoza situation here, and we're using egregiousness and widespread violation when there are state officials who were the actors. Is that correct? We are assuming that Oliver Ramos and Lopez Mendoza apply. Lopez Mendoza, although they were contemplating federal agents, specifically they were contemplating immigration proceedings. And the point is that the exclusionary rule doesn't fit into those civil immigration proceedings, and they relied on Janus in making that comparison. And our position is that that applies even when there are state actors. Okay. How about the balancing that your opponent talked about with the deterrent effect even being greater when it's a state official versus federal official? As you pointed out... So that it would be a wide open exclusionary rule as compared to just egregiousness and widespread. Well, Your Honor pointed out most of these police officers have zero involvement once they pass the unlawful aliens off to ICE. I'm not even sure the immigration court has subpoena power over them. That hasn't been decided. The Fourth Circuit is the only one that has even applied the egregious rule to state actors in Sanchez. The Eighth Circuit has questioned whether it would do that. So it is whether it would even apply the egregious standard. So no court in this country has applied the full exclusionary rule in immigration proceedings, and we don't think that this case would be an appropriate reason to move away from the Supreme Court's guidance on this issue. But you think it does fit within Lopez Mendoza? Certainly. Can you conceive of any way that this could have a deterrent effect if we were to adopt a broader rule? No, because the officers really are not involved. Potentially, if they are committing these violations, they could be sued in civil court for those violations, but they're not subject to the jurisdiction of the immigration court, so we question what effect that would really have on them. They don't follow the proceedings. Many times, they don't have any involvement whatsoever. So what's the purpose of a 287 agreement? That is something that ICE has created as a regulatory means of... Because they want these persons to be trained, do they not? Well, in certain circumstances, but again, Trooper Mackey did not do anything. His conduct was not egregious, and everything that they're saying about any race-based motivations is speculative. There's nothing in the record to support that. Well, well, you haven't... Go ahead. The duration, the length of time that it took to deal with this was certainly excessive, was it not? Well, if I could revisit the facts just for a moment. The affidavits say they were pulled over around 8. There is some sort of admission, which the affidavits are silent on, but there was some admission because when he calls DHS at 8.30, he correctly identifies what countries they're from. But more importantly, he's been given the driver's license or number of his information. And there must have been a period of time where Trooper Mackey was tracking that information down and then discovered that the license was revoked or suspended because that's the second citation he issues at 8.57. So for all we know, that was a reasonable extension of that lawful traffic stop for him to go about his law enforcement duties and ensure that he figured out what was going on with the driver who only provided a social security card when he asked for his registration and his license. So yes, even though the vehicle owner, who was a passenger, had his license and registration, the driver did not provide that and wanted him to call his wife. So it's clear from the outset that this stop was not going to be a normal speeding traffic citation. They moved to the rest stop as opposed to just conducting this on the side of the road for a lengthy period of time. What if he was profiling Officer Mackey? Are you suggesting... What if he was? Assume he was. Then what happens? You're saying that there's nothing that can be done? Other than he can be sued, there's nothing that can be done at the BIA level? No, we're saying that it could be excluded as an egregious violation if race was the motivating factor. That's what Oliver Ramos contemplates, but there's no proof of that. It's their burden to prove that. Well, but there's no proof of it, but shouldn't there have been a suppression hearing to determine that? But they have to meet the burden of demonstrating the suppression hearing is warranted, and that hasn't happened. There are a lot of blanks in the affidavits, which is supposed to be their best evidence that an egregious violation has occurred. But how about the fact that after you have confronted the people in the front of the car, you determine they're speeding, you're looking into the lights and suspension, why would you even look in the back? I mean, maybe you look in the back and you see people are sleeping, so that's fine. You're not going to get accosted or whatever, but what basis is there for that? Isn't there at least an inference that it was because they were Hispanic? Not necessarily, because the case law says that a law enforcement officer during a lawful traffic stop can ask for identification. He can ask for people to get out of the car. How many people were in the back of the car? Nine. Nine people with brown skin. The ACL, you filed a brief in favor of the full exclusionary rule, and you suggested that we just thought it would ignore the brief. But why don't you address the merits argument that was made in there? There is a cost-benefit analysis that needs to be considered by courts in determining how to apply the exclusionary rule. Our position is that applying the full exclusionary rule in immigration proceedings would be contravening Lopez Mendoza and Oliver Ramos. Just because the way that Lopez Mendoza contemplates the civil immigration proceeding, it's clear that they don't believe that it should apply at all in full. And applying it to a- What about the Fort Jericho case in Sanchez, which seems to go a little bit further than Lopez Mendoza, where Judge Montz had written that a stop or seizure based solely on an abuse of an officer's legal authority and without reasonable suspicion of criminal activity will usually be egregious, close quote. But they also say that they don't agree that the likely additional deterrent value of the full exclusionary rule as opposed to the egregious violation rule is appreciable or substantial enough to justify its appreciation. That's on 789. I got it, but- And find that asking whether they were illegal or legal was not an egregious violation. But if we were to adopt the Fourth Circuit's analysis, analytical method of going through this case, wouldn't we grant the petitions and send it back? I'm sorry. If we were to adopt the Sanchez approach, that a stop or seizure based solely on an abuse of this officer's legal authority and without reasonable suspicion of criminal activity will usually be egregious, wouldn't we just send it back to find out whether usually applies or doesn't apply based on the facts here? In other words, a hearing, as Judge Randells talked about. No, our position would be that the court would find, like the court in Sanchez, that there was a lawful stop and that- You may be right. What happened was not egregious. You may be right, but is that our call or is that the call of the judge or the immigration judge on the front line? This court can decide that they have not shown a prima facie case for a suppression hearing. They have to first hit that hurdle. And that's what the court found in Sanchez. What would satisfy then? I'm curious. What is it that you kind of like, oh, okay, then there's enough for a hearing. Isn't there enough here that there's an inference that going back and questioning them and calling ICE and detaining them, not letting them go to the bathroom, not letting them have the air conditioner on, pinning their car, they're not free to leave. Isn't there enough to say, you know, we should really hear from both sides to decide whether this is egregious? You may win, but not now. Our position is that they didn't meet their burden. It's the Oliver Ramos discussed coercion, physical threats, duress. Race-based would be enough. Oliver Ramos said race-based would almost tip the scale. This was a lawful traffic stop, and he had to follow up with about the driver's license. He could have sat in his car there and waited for the information given the citation going on his way. The way to do that is go back to his vehicle and check it out. The owner is in the passenger side, right? And the other person said, you can call my wife. And he had a Social Security card. He has a Social Security card. So there's no problem in the front seat here. But he's constitutionally able to ask for ID. He didn't violate the Constitution by asking that question. And as far as the I-213, there's no evidence of misconduct on the part of ICE. You're saying that asking for information was the problem. Well, asking for information from the driver or the owner. But if he didn't have consent, and we don't know that, and opens the back door and sees people in there and then starts asking questions and then does a detention, there's a whole lot of complexity here. This isn't so simple. Right, but that's part of the problem with their evidence. I mean, first of all, they said that he asked for their papers. Well, that was translated by someone in the front seat who didn't provide an affidavit. The burden is on them. It's not on the driver. And they're not even saying that the information, the I-213 is unreliable or that it's false. And I believe the I-213 indicates that they freely admitted their status as soon as ICE got there. Well, we asked to go to the bathroom. Officer told us not allowed. We're only allowed over an hour after being pulled over. We refused water or food. We asked to go to the bathroom. He didn't let us go. And Officer Park was right behind us. We couldn't leave because, I mean, they're basically arrested. They're certainly in detention, are they not? For not a criminal violation. It is not a criminal violation for a removable alien to be in the United States, according to Arizona, of the United States in 2012. So. But it's not for a lengthy period of time. They've already made the admission they're not lawfully here. And ICE has directed that they're responding. Well, but. I don't want to argue with him. All right. I mean, at this point, what is the. If the I-213 is suppressed, what are the constraints on ICE after that to apprehend these individuals? I'm not sure that's been decided in any court. I don't have a good answer for that. We perhaps have to wait to see if they did re-arrest and then see if they had independent information. Well, it wouldn't be a re-arrest. It would be the issuance of a notice to appear. That's the procedure, correct? Right. I would imagine that might be true. All right. No further questions. Nothing further. Thank you very much. Just to clarify a couple of points. The record shows that the trooper Mackey ordered the van to the traffic stop before he completed any sort of computerized check of the license. So the stop took a detour immediately. But even if the amount of time the stop was prolonged was not that long or was de minimis, there's no de minimis exception to the detour rule that we have in Rodriguez and then again in the United States versus Clark. This court has decided. So that's point one. Point two, your honors, we're asking about the deterrent effect on the state trooper. If the exclusionary rule applies, then ICE would know that it would stop responding to state troopers unless they called and said, hey, we have this guy on a reasonable suspicious of a crime. And oh, by the way, we also suspect that he might not be documented. So that would be another deterrent effect on the state officer. Number three, the government keeps harping on the lack of evidence in the record. Well, that's because we weren't allowed to present evidence. Our subpoenas weren't granted. There was no hearing. This was all done on the papers. But finally, our position is that there's no additional hearing necessary. Sure, if you were to remand and order an additional hearing, there would be much more evidence in the record. But we think that as the record stands now, there is clear evidence of egregiousness, both because the stop, the prolonging of the stop was race based and because the officer knew or should have known that his attempt to enforce the federal immigration laws was unauthorized. Is there any constraint on the IJ subpoenaing the trooper in this circumstance? I'm sorry, I didn't hear you. Would there be any constraints on the immigration judge to subpoena Trooper Mackey or somebody in his position, a state official in this? Our position is that he could authorize the subpoenas and then it would be a question of enforcement. But we believe they would be enforceable. So to be clear, the relief we're seeking is that the order of removal be vacated. And we would like the court to order ICE to end the deportation proceedings. And in fact, to order ICE to bring back Mr. Yoke Ouse, who has already been deported to Guatemala. And in the alternative, though, if there's not enough evidence in the record, then we submit the case should be remanded so that an evidentiary hearing and discovery can be taken. OK, thank you. Did you just pro bono this case? Yes, sir. You did. Thank you very much for your work on this. It's much appreciated by us. I would ask if a transcript could be prepared of this oral argument and if you could just split the costs on that. Is that OK? Thank you. Thank you. Thank you to both counsel. And we'll take the matter under advisement.